States v. Louis. Mr. Waxman. Good morning, Your Honors. May it please the Court, Benjamin Waxman, together with co-counsel Joe Nascimento, on behalf of Terry Pierre Louis, I've reserved three minutes for rebuttal. This case calls upon the Court to give teeth and meaning to the Fifth Amendment's command that no person can be convicted except upon proof beyond all reasonable doubt. The government cannot rely upon building inference upon inference, piling inference upon inference. Any inferences that the government relies on must be reasonable, and those inferences cannot attenuate the evidence from the element that needs to be proven. If the evidence viewed in the light most favorable to the government supports equally or nearly equally an inference of innocence and guilt, then the jury has to accept the one of innocence and the defendant has to be acquitted. In this case, the issue is whether the government has sufficiently proved that Mr. Louis had knowledge of a conspiracy, not just any conspiracy, but a conspiracy to traffic in narcotics, and whether the government adequately proved that he had knowledge that there was cocaine wrapped in these boxes that were placed in his car. Why couldn't the jury infer knowledge from his presence around the boxes and, more significantly, his flight in? And then I think the third thing, it seems like the government is relying upon presence, flight, and he knew that this barge exported cargo but not imported cargo. Those are three things that the government relied on. I think those are three things that the government is relying on. But ultimately, this court has repeatedly and consistently said that presence, together with association, is not sufficient to prove knowledge of a conspiracy or a substantive offense of possession with intent to distribute. The court has gone further and has consistently emphasized that presence, association, even coupled with flight. Mere presence. Mere presence. And in this case, we have presence and association. So he had been seen at this shipyard some 50 to 100 times before this particular day. He had identification as a port employee. He was an employee of Mr. Borgella, who was the person who owned the Ana Cecilia, and he presented himself openly and notoriously when he appeared on the day, the first day where they took a photograph of his driver's license and allowed him to come in to provide food to the ship members who had been quarantined on this ship. What about the line of cases where convictions have been upheld on the drug mule cases on the basis that the seller had entrusted someone with valuable merchandise, drugs in that case, and therefore the jury can infer a relationship between the two? That is not a reasonable inference. If the court looks at one of the Fifth Circuit cases, I believe it's the fifth or ninth, a case called Littrell, where the court looked at that particular driver and said it's a tactic and strategy of conspirators to provide drugs and involve people who have no knowledge of the crime that's being committed. Is there evidence of the street value of the drugs? Absolutely. There's evidence that it was about $3 million to $5 million. But there have been cases... That's a lot of entrustment. That is, for a momentary... Understand that he was only constructively in possession, as they put it in his car, for virtually moments before he was accosted by the police, and as Judge Wilson says, he fled. And so what's the evidence about flight? So here he was, accosted by three cruisers, lights and sirens blaring, the agents jumped out, plane closed the agents, guns brandished, and he fled. So he may have very well fled because he thought he was going to be a victim of a robbery. He was being accosted by people he didn't know. He may have had other problems in his life, but there's nothing, there's not a scintilla of evidence in this record that he knew that these boxes in his car contained drugs, for instance. They could have perhaps contained art or other commercial... I want to go back to the cases in which the court has allowed the inference that if you're entrusted with a large amount of drugs or money or whatever it is, an inference can be drawn that there's a relationship there between the two and those convictions have been upheld. How do you distinguish those cases? Well, I've cited several cases. One that I think is particularly good is the Pace case out of the Eighth Circuit, where Pace was the driver of a vehicle from California. I believe it was supposedly headed to Chicago. He was in the car with Mason. There were 200 pounds of cocaine concealed in the back of that car in two duffel bags that were on the floorboard of the back seat and another duffel bag and piece of luggage that was in the partially concealed rear compartment of the car. He was the driver of the vehicle. He had a suspended license. He was stopped for speeding, and very quickly he consented to a search of the car. They found the drugs, which were right there in a duffel bag, unlike in this case where they were in a sealed box, sealed with clear plastic and tape and wrapped again. And they even pointed out that Pace was nervous when he was questioned. There's not even any evidence in this record that the CBP officers who had been surveilling the shipyard and had watched this ship and had searched it from stem to stern had even noticed Mr. Louis until the very moment where he drove up to an area nearby where these boxes were located and the boxes were placed in his car. He never even once touched the cargo here. They searched it for fingerprints and DNA. There was no evidence that he had even touched these boxes. In the Pace case, the court said that really the evidence boiled down to mere presence, association, and the only way the government could make its case was to pile inference upon inference. In this case, there's no direct evidence that Louis knew that this cargo ship contained any kind of contraband. Remember, he was not even charged with importation. Borgella was charged with importation in connection with the 275 kilos that was later found on the ship. They didn't even charge Louis with that. He was not even held responsible under a preponderance standard for that cocaine found on the ship. So there was definitely an absence of evidence of knowledge. There wasn't a scintilla. But before the government can get to its proof that he knew, there's no evidence that he knew there was contraband. But that wouldn't even be enough because the government would have been required to show that he knew that there were drugs and cocaine on the ship. Then the government needed to have an inference or to establish that he knew there was some kind of contraband that was placed in these boxes. So they've got to pile the one inference that he knew there was contraband. Then they need the inference that he knew. You said contraband. The way I read the statute, he has to know that there is a controlled substance on the schedule in the boxes. Is that what you mean? No. There's no evidence. I know you're arguing there's no evidence. But in order for the government to convict him beyond a reasonable doubt, the government had to establish that he knew that there was a controlled substance on the schedules in the boxes. Is that right? That is correct, a controlled substance. And the cases that talk about knowledge. Because if it's some other type of contraband, then the government could not convict him of this crime, right? That's correct because this is a specific, both the conspiracy and the possession with intent, are specific intent crimes. And the government bears the burden of showing, not merely that he was in an atmosphere of sinister conduct, but that he specifically knew this was a conspiracy, not to smuggle out commercial items from Haiti, not to smuggle out art, but that the conspiracy and the drugs that were in these boxes were actually drugs and narcotics. And there's not a scintilla of evidence about his knowledge in that regard. And that's why this court in Hernandez, citing to Ingram, said that the government bears a particularly heavy burden to show knowledge by clear and unequivocal proof. And the cases like Pace and the other cases from this court like O'Hagan, which is cited in our brief, really zero in on the fact that it's not enough to show a conspiracy to do something illegal. You have to show knowledge that this was a narcotics offense. And again, the government cannot get there without the inference that he knew there was some kind of contraband, that he knew that contraband on the ship was narcotics. That doesn't even get the government where it needs to go. They then need to rely on the inference that he knew there was some kind of contraband in these boxes. There was no evidence of that. And then beyond that, they need the inference that he knew that contraband was cocaine. The flight was inherently ambiguous. And again, this court has repeatedly emphasized that presence, association, and flight are simply insufficient to establish that heavy burden of demonstrating knowledge. And I urge the court to look carefully at the case of Pace and also, Judge Choflat, the case of Charles, which you were on the panel of, which I think also provides a very strong analog. That's a case where the government had video of a meeting with an informant, including Ellis Saint. There was no sound at that meeting. And at that meeting, they planned a home invasion robbery to steal money. Ellis Saint was the driver, drove the conspirators to the place where they committed the home invasion robbery and was arrested at that scene. And that court in Charles said that the evidence was insufficient to show that Ellis Saint, the driver who was present at that videotaped meeting, where there was no sound, much like this case where there's not even any conspiratorial conversations that implicate Louis, he never made a post-arrest statement. Even Borgella, when he gave his, when he pled guilty, never once implicated Louis. And in that case, the court found that the evidence was legally insufficient against Ellis Saint. And I submit that that case is also a great analog to this case.  Mr. Langley. Good morning, Your Honors. Matthew Langley for the United States. I was also the prosecutor who tried the case at the district court level. And may it please the court, the appellant makes two arguments regarding the sufficiency of the evidence. First, that the appellant didn't have the knowledge of the conspiracy requisite here, that he was merely present and then fled. And second, that even if he did have knowledge of the conspiracy, that we couldn't have proven that the contraband inside the boxes was in fact cocaine. And I'd like to take both arguments in turn. First, in regards to just a mere presence in flight, it's uncontrovertible that the evidence showed that he was not just a merely present there, but that the appellant was an active participant in the conspiracy. The evidence showed that he worked at the shipyard for more than a year with the co-defendant and with the very ship that was used to transport the cocaine. Mike Kitami, the shipyard owner, testified that he had worked there since July of 2014, that he in fact had an office in the building at the shipyard, the only office at the shipyard, that he was a liaison between the co-defendant and the ship agent for the ship that was used to transport the cocaine. And Mr. Kitami testified that he had seen the appellant on the ship, in and around the ship, from the time that it came into port in the Miami River until finally the cocaine was loaded into his car and he fled. Where would I go in the record to find some evidence that he knew that there was a controlled substance, cocaine, in those boxes? Certainly. There's more than enough evidence for the jury to have reasonably concluded that the appellant knew that what was in those two boxes was a controlled substance. And I'd like to start here that it was testified and the evidence showed that it was commonly known that coastal freighters, the same ship that was the Ana Cecilia, the ship that transported the cocaine, that were traveling from Haiti to the Miami River were commonly used to transport narcotics. CBP officer Gianni Dominguez testified that he had seized cocaine from four vessels coming from Haiti to the Miami River that year alone. And he testified that he had worked at the same shipyard at the Miami River where the appellant worked, where the seizure took place. HSI special agent . . . You could say that about a lot of rivers around the state of Florida that cocaine comes in. But I'm looking for some evidence that this guy knew. Certainly. You said it was commonly known. But what about Mr. Luis? Where is the evidence that he knew that there was cocaine? Well, the jury heard . . . Anybody testify to that? The testimony didn't . . . There was no recording of the appellant admitting that he knew that there was cocaine in the boxes. But the evidence showed that . . . Was there a witness who got on the witness stand and gave any kind of evidence that the jury could rely upon to conclude that he knew that there was cocaine in those boxes? Certainly. Well, any controlled substance would be enough to satisfy the standard here. Which witness would say he knew there was a controlled substance in those boxes? Well, I would submit that when an HSI agent gets on the stand and says that he's made narcotic seizures on a coastal freighter, the same ship that we see here, that was traveling from Haiti and the Bahamas at the shipyard that we were at and the Miami River, that it was reasonable for the jury to conclude . . . Is there evidence that Louis knew about this drug trafficking from Haiti? Well, I think it's reasonable for the jury to have concluded . . . I'm not talking about somebody told him. Right. What's the circumstantial evidence that he would have been aware of that? Well, Mr. Louis had worked at that same shipyard where HSI agents and CBP agents had made seizures before for more than a year, the same shipyard on the Miami River. He was a liaison for the coastal freighter, the same type of ship that was used to transport narcotics. That coastal freighter that he worked with as a liaison traveled from Haiti and back, the same ship, the same type of travel that was used, that was testified, was used to transport narcotics. He worked with the co-defendant, and defense counsel admitted . . . I'm talking about Mr. Bourgella. Mr. Bourgella. Is this plea agreement in the . . . he pled guilty and he was sentenced to 108 months, but he didn't testify at the trial, did he? He did not testify at the trial. Boy, he . . . gosh, he . . . That was a strategic . . . That's rather odd, isn't it? Strategic decision not to put the co-defendant with a history of narcotics trafficking. He pled guilty. He did indeed. He got 108 months in prison. The government felt that it was able to prove its burden of knowledge of the conspiracy and knowledge of a possession of controlled substance . . . If I'm a . . . . . . without having to put the co-defendant on the stand, and the jury, looking at the evidence, reasonably concluded and agreed that Mr. Bourgella . . . I think we're still looking for something on the record that connects up the knowledge inside his head. Tick off every one of the facts that you say together show knowledge. Certainly. Instead of just loose argument. Sure. Number . . . We need . . . These cases are . . . you draw inferences about knowledge. You draw inferences about all kinds of things. Right. It comes from little . . . what I call grains of sand, little facts that pyramid to the ultimate conclusion, that you haven't been ticking them off. All we know from your argument so far is that he worked there for a year, that drugs had been coming into that port off and on from Haiti, and that he was the liaison with the trafficker. Right. You haven't said anything else. We know he flew when he was stopped. Second . . . Whatever circumstantial facts, you know what I'm talking about? Absolutely. All right. Second, he knew that CBP officers had searched that ship when the ship came on board. So he knew that CBP was looking for something on that ship, the same type of ship that he knew was used to traffic narcotics. Third, he knew the ship was empty. He knew that CBP hadn't found anything. And so it's reasonable to conclude that when those two boxes came off the ship, and he was there at the moment when they came off . . . How did he know that? How did he know that the ship was empty? No, how did he know that the ship had been searched for drugs and they didn't find anything? They had . . . Of course, that seems like that's evidence in his favor. But in any event, where's the evidence in the record that he knew that the ship had been searched for drugs? Mr. Pierre-Louis showed up on September 5th and went on board the ship while CBP was searching. He interacted with the CBP officer who was searching during that day and . . . Searching for narcotics. Searching for narcotics. And the CBP didn't find anything because the ship wasn't seized and no one was arrested and he would have known that because he was the ship liaison for that ship. He worked for the company that owned that ship. And I think the final and maybe most important inference that we can draw, in addition to all of this . . . Give us the circumstantial facts. He was here this time, here . . . Do you understand what I'm talking about? Certainly I do. So he knew the ship was empty. He knew that the ship was used to commonly known that it was . . . Because he knew it was empty because he went on the ship? Because he went on the ship. All right, then tell us that. Because he went on the ship. He knew the ship was empty because he was on the ship and he knew the manifest and everyone testified that this ship came in empty and left full and he would have known that because he worked for that ship. And finally, reasonable . . . What if he thought that there was something else illegal in the boxes but not a controlled substance that's listed on the schedules? Would the evidence be sufficient to convict him of these crimes? Well, the government bears the burden to show through reasonable inferences and through circumstantial evidence that he knew that there was a controlled substance. Give us the facts, counsel. And so when he was entrusted with 136 kilograms of cocaine worth $3 million wholesale, $11 million on the street, those boxes were loaded into the back seat of his car. Where was he when the forklift went onto the ship? He is at the spot where the boxes are seen being lifted up and carried off the ship. The Exhibit 2, the poll camera, shows that he's at the exact spot when those cardboard boxes are lifted off. The cardboard boxes are brought down the gangplank and are immediately covered. And what was he entrusted to do? He was entrusted to take sole possession . . . To take it where? Of $11 million worth of cocaine. Well, the defense counsel says that, well, he only possessed the cocaine . . . Go on ahead, counsel. . . . for mere minutes. And the reason why is because before CBP officers could continue, he fled. He fled. Did he have some instructions as to where he was going to take this? When you say entrusted, was he going to take it to another county, another country, or just down the street? Well, he was going to take it off the shipyard that day, that's for sure. Where was he headed in the car? He was headed off the shipyard. Describe the shipyard. The shipyard is very large. And the . . . A fence around it, he was going through a gate, what? Right, and the ship is at the end of the shipyard. The two huge boxes of cocaine weighing 250 pounds, taking up the entirety of his back seat, are loaded into the back seat of his car. He immediately takes off. What's the destination? What did the witnesses say that the destination for the boxes? Well, there was no evidence as to the final destination of the boxes. The entrusted cases have to do with somebody who takes possession and is on his own for some period of time, goes to another country or something else, and you can infer from that that that's a relationship. If this fellow was just taking the stuff down to another aspect, to another place in the shipyard, that's a different case. Well, he's going out of the shipyard. How do you establish that? He goes to the gate. The chain of the shipyard is lifted. He drives out of the gate. Is anybody at the gate? Is there a guard at the gate? Tell us what it looks like, counsel. We don't have a picture. Certainly. The gate has a chain that goes across it. He drives up to the chain. A guard gets out, lifts the chain. He drives through, past the chain, past the gate yard. He goes out almost to the street, and that's when CBP officers confront him. The lights and sirens are flashing, and before the CBP officers and HSI officers are even able to get out of their cars, he is out of his car, running into the shipyard. He interacts with the co-defendant, continues to flee, and as defense counsel admitted, he not only fled, but he stayed a fugitive for three weeks. You know, the two two-foot boxes. Did he work for the co-defendant? Was that the relationship with an employee? He worked with and for the co-defendant. The co-defendant was the owner of the ship used to transport the cocaine. I mean in a non-conspiracy or drug relation, in a day-to-day basis, he was an employee of the co-defendant and had regular duties? Yes, he had regular duties. Who paid his salary? I believe the co-defendant did pay his salary. The co-defendant paid him? Yes. So he was stationed at the shipyard working for the co-defendant? That's correct. So when the ship would come in, he would service it with the co-defendant whenever it was necessary? The testimony is that he filled out paperwork. He was working in the office. He was a liaison with a ship agent that reported what the manifest was and when the ship would enter and exit. He was much more than just a— Did he work for anybody else in the shipyard? No, he worked exclusively for the co-defendant and exclusively with the ship that was used to transport the cocaine. He worked for Mr. Bourgella? He worked for and with Mr. Bourgella. Who did not testify? Who did not testify, no. If Mr. Bourgella hired a summer college student to move boxes for him and he put the boxes in the car and the lights started blaring and he ran that summer— Well, those would be facts that were much different than the facts presented at trial. Not much different when all you have are—you've got his presence, video presence at the scene in flight. Well, you have him on the ship when CBP officers are searching the ship. You have him working for Mr. Bourgella. Bourgella had a record. For more than a year. Bourgella not only had a record— He had a record. What did Louis know about the record? The evidence presented at trial was not about Louis knowing about the record, but Louis knowing that Mr. Bourgella was a confidential informant, had previously been a confidential informant. Louis knew that? Louis knew that. A confidential informant about what? That testimony regarding what specifically the co-defendant was, his previous record, that was not evidence. No, a confidential informant about what to whom? To HSI and CBP. The very—in fact, the very— Louis knew that? Louis knew that. How do we know he knew that? Defense counsel admitted— How do we know that he knew that? Defense counsel admitted that he—that the appellant, Mr. Louis, knew— Defense counsel testified? He admitted at opening that— An opening statement. An opening statement. That's at 111, page 121. Admitted that the appellant knew that he was a confidential informant, and in fact— Was there some testimony at the trial? Yes. The testimony revealed that the co-defendant was a confidential informant, in fact, for the very HSI officers that had executed the— Who testified to that? I guess what we're looking for is some evidence that Louis knew that he was a confidential informant. You might have some testimony that he was a confidential informant. Right. You might even have some statement by the defense attorney during opening statement, and I'm sure the judge instructed the jury that what the lawyers say in the case is not evidence. Certainly. Gentlemen, you base your decision on the evidence and not what the lawyers say. Certainly. So I'm looking for some evidence in the record that Mr. Louis knew that Mr. Borgella was a confidential informant. The—several of the HSI agents on cross-examination, Rafael Quinqueira, Gianni Dominguez, were questioned about the relationship between Mr. Borgella, the co-defendant, and his relationship with the very agents that had executed the seizure on the boat, and the testimony came out that he was a CI, and I think— And that Louis knew it or did not know it? Well, there wasn't testimony as to Louis' knowledge, but I think— No, I just— Go ahead, counsel. The testimony didn't reflect that, of whether Louis knew or didn't know whether Mr. Borgella was a confidential informant. The remarks as you state by defense counsel are not evidence, but I think it's reasonable for a jury to conclude that a man that he worked with for over a year— You said with or for? With and for. Who paid him? Mr. Borgella, I believe, paid— He worked for him. Yeah, he worked for him. He worked for him, but not in a— Whose car was he using? He was using his own car. The appellant's own car was loaded with 136 kilograms of cocaine worth $11 million. It wasn't secreted in the car. It wasn't hidden in the car. Counsel, your time's up. We're going to have to read the record from stem to stern. Thank you, Your Honor. Mr. Waxman. Your Honor, the government relies—the first thing they said is, well, of course we know there's an inference here. He was an employee of Borgella. Well, an employee relationship is the exact reason why that type of association does not support an inference of knowledge. Counsel, you're making the classic circumstantial evidence argument. Correct. This little fact doesn't mean anything, this little fact doesn't mean anything, and this little fact doesn't mean anything. What's the best case you think the government has in terms of adding them all up? The best case that the government has is that he was an employee. He knew the ship had been searched. And we don't even know what information Louis had about—do we really think that CBP— that the ship was searched when it came in? Correct. There's no information that he had— No information, whatever, from which a jury could find that he was aware that the ship had been searched. No, no, no. He was at the port. He went there while the search was underway. Okay, so he knew the ship was searched for drugs. No, he didn't know what it was being searched for. There's no evidence that he knew what it was being searched for. Well, it was searched for something. Right. It was searched for four days, and— But it had no cargo. At that time, it had no cargo. Is there evidence the ship came in without a cargo? Is there evidence that it came in with or without a cargo, and if it did, what was the cargo? The evidence was that when the ship was there, when it first came in, that it had no cargo. It had no cargo, but there was still a search going on. Correct. And that search disclosed nothing after four days. We understand that. And Louis was an employee of Borgello, so he had a reason to be there with regard to his employment there. If this was an illegal thing for the boat to be there, the ship was there for an additional 11 days after it was shipped. It wasn't sent out to sea. They didn't say that it couldn't be there, and there was normal activity going on during that time dealing with this ship. But there was no evidence that he was entrusted in any way. The evidence with regard to the brief moments that he was leaving the ship and going out the yard was that he was driving very slowly as Borgello walked next to his car, and that was what happened moments before when he was accosted by these agents. Where was Borgello when he was accosted after he got out of the shipyard? To the best of the record, he was right next to or very close by the car, that he was seeming to escort very slowly just through the little chain, and that's where the confrontation occurred. And there was no evidence other than perhaps he was instructed. I mean, the reasonable inferences, the innocent ones, are that he's an employee. His employer, Borgello, says, you need to go get your car. I'm putting this cargo on. Follow me. And he did exactly what he was told, just like a summer intern or anyone else might do. I think we have your case. Thank you, Your Honors. I'll go to the next case, Francisco v. The Attorney General.